IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------ :
                                                       : CASE NO.  1:14-CV-00843
SAMUEL SWANN, et al.,                                  :
                                                       :
                                      Plaintiffs,      : MEMORANDUM OPINION AND
                                                       : ORDER GRANTING THE
                    -vs-                               : DEFENDANTS' MOTION TO DISMISS
                                                       :
                                                       :
FRESENIUS MANAGEMENT                                   :
SERVICES, INC. d/b/a FRESENIUS                         :
MEDICAL CARE, et al.,                                  :

                                      Defendants.
------------------------------------------------------

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Before the Court is a motion to dismiss filed by the defendants Fresenius Management Services Inc. ("Fresenius"), Laura Conaway, and Michelle Wiest. The plaintiffs Samuel and Suzan Swann have responded in opposition, and the defendants replied. For the reasons that follow, the motion will be granted.

**I. Background**

The following factual allegations, drawn from the plaintiffs' Amended Complaint, are accepted as true for the purpose of deciding the defendants' motion. Beginning in 2007, the plaintiff Mr. Swann was employed by Renal Advantage, Inc. ("Renal

Advantage"), a provider of dialysis services. (Amended Complaint ¶20). In February 2009, Mr. Swann and Renal Advantage entered into a Confidentiality, Noncompete, and Severance Agreement. (Amended Complaint ¶21). As part of the Severance Agreement, Renal Advantage promised to pay Mr. Swann his base salary for twelve months after termination, if he was terminated "without cause." (Amended Complaint ¶22). In 2011, Mr. Swann and Renal Advantage entered into a Retention Bonus Award Agreement, which provided that certain bonuses would be paid to Mr. Swann at specified times. (Amended Complaint ¶23).

Between 2011 and 2012, Renal Advantage was acquired by another renal dialysis company, Liberty Dialysis Holdings, Inc., which was acquired by Fresenius Management Services, Inc., the defendant in the present case. (Amended Complaint ¶24). In the spring of 2012, Plaintiff Swann interviewed with Fresenius' management team, and he was offered a position in Fresenius' Cleveland office as Regional Vice President Eastern Ohio. (Amended Complaint ¶25). Mr. Swann accepted the offer and began work for Fresenius in Cleveland, under the supervision of defendants Laura Conaway and Michelle Wiest. (Amended Complaint ¶26). In June 2012, Fresenius agreed to comply with the payment obligations detailed in the Severance Agreement and the Bonus Agreement described above. (Amended Complaint ¶27). In 2013, Mr. Swann was given a raise and paid a bonus pursuant to the Bonus Agreement. (Amended Complaint ¶¶29, 30).

On or about September 25, 2013, Fresenius, by and through its management team, including Ms. Wiest, announced a new admission policy. According to the plaintiffs, the policy gave preferential admission and scheduling treatment to

commercially-insured patients over patients who were insured by the government, in light of low-reimbursement rates from government and private payers. It is alleged that Fresenius employees, such as Mr. Swann, were instructed to accommodate new commercially insured patients even if it meant bumping a current patient's scheduled shift. (Amended Complaint ¶31). On or about September 27, 2013, Mr. Swann was allegedly directed by Fresenius' management to discharge two patients solely because the patients' private insurance company had decreased its reimbursement rate to 135% of the Medicare reimbursement rate for dialysis services. (Amended Complaint ¶32).According to the plaintiffs, the patients were compliant with their regimen and were in no way "disruptive" or "abusive." (Amended Complaint ¶34).

Mr. Swann disagreed with the new policy. In a series of conversations and emails with management, Mr. Swann expressed his disagreement with the policy and the directive to involuntarily discharge the two patients described above. He also communicated in writing to management, through his team's licensed social worker, that the proposed involuntary discharge violated the applicable Medicare regulations governing dialysis centers as well as the Ohio Renal Network's policies (Amended Complaint ¶33). Fresenius' Medical Director and others also allegedly questioned the legitimacy of involuntarily discharging the patients based solely on a reduction in reimbursement rate from health insurance carrier. (Amended Complaint ¶34)

Notwithstanding the concerns raised by Mr. Swann and others, Fresenius retained the new admission policy. (Amended Complaint ¶35). On or about October 21, 2013, Mr. Swann again explained to management his concern that the new admission policy and the decision to involuntarily discharge the patients were "unethical," and

3

"morally wrong," and that the company was exposed to "compliance risks with CMS and the Renal Network." The plaintiff informed Fresenius that he found it "impossible to align and fully support this initiative" and, had no alternative but to provide six-week notice of his termination. (Amended Complaint ¶36).

On October 25, 2013, in response to Mr. Swann's written notice, Ms. Conaway allegedly informed Mr. Swann that the new admission policy complied with the law. Ms. Conaway also allegedly defended the decision to involuntarily discharge the patients, because in Fresenius' view, a "material reduction" in payment constitutes "non-payment" under the applicable laws and regulations. (Amended Complaint ¶37).

On October 23, 2013, Ms. Conaway met with Mr. Swann and advised him that his resignation was accepted effective immediately. She further advised Mr. Swann that his pay and health insurance benefits would be terminated that day. According to Mr. Swann, the sole reason given for his termination was the October 21, 2013 notice. (Amended Complaint ¶38). On information and belief, Mr Swann claims that Ms. Wiest would have participated in all decisions regarding his employment status.(Amended Complaint ¶39).

On approximately October 25, 2013, Ms. Conaway called Mr. Swann at his home and advised him that, contrary to what was said on October 23, 2013, he would be paid through November 29, 2013 in lieu of notice and that a "package" would be forwarded to him shortly. (Amended Complaint ¶40). On or about October 29, 2013, the plaintiff was informed in writing by Ms. Conaway that his employment with Fresenius had terminated effective October 26, 2013 but that the company would pay him through November 29, 2013. The "package" did not offer to pay Mr. Swann any severance. The

defendants allegedly requested that Mr. Swann sign a document binding him to various obligations to Fresenius with no consideration. Mr. Swann did not sign the proposed agreement. (Amended Complaint ¶41).

Mr. Swann filed this lawsuit April 18, 2014. In his first amended complaint, he alleges that he was constructively discharged when he was subjected to the intolerable work conditions created when Fresenius adopted the new admission policy. He maintains (1) that the defendants violated Ohio's Whistleblower Statute, R.C.§ 4113.52 when he was discharged after having complained about the alleged illegal/unethical nature of Fresenius' new admissions policy; (2) that he was wrongfully discharged in violation of Ohio public policy; (3) that Fresenius breached its contractual obligation to pay him his severance pay; and (4) that he relied, to his detriment, on promises contained in Fresenius' Code of Business Conduct. Mr. Swann's spouse, Suzan Swann, alleges that she lost the companionship, services, and affection of her husband, as a result of the defendants' actions.

The defendants now move to dismiss the Amended Complaint on the ground that it fails to state a claim upon which relief can be granted.

## II. Law and Argument

The plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A 12(b)(6) motion tests the sufficiency of the complaint. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

### A. The Plaintiff's Ohio Whistleblower Claim

First, the Court considers whether the plaintiff has pled sufficient facts to support his claim under the Ohio Whistleblower Statute, R.C. 4113.52 (B). In order to establish a violation of the Ohio Whistleblower Statute, "a plaintiff must first make a prima facie case by showing that (1) he or she engaged in activity which would bring him or her under the protection of the statute, (2) [he or she] was subject to an adverse employment action and (3) [that] there was a causal link between the protected activity and the adverse employment action." Wood v. Dorcas, 142 Ohio App.3d 783, 757 N.E.2d 17, 23 (2001).

In this instance, the defendants maintain that Mr. Swann's Whistleblower claim fails as a matter of law because he voluntarily resigned. As such, the defendants argue, he was not subject to an adverse employment action. While Mr. Swann admits that he submitted a letter of resignation, he maintains that his resignation was involuntary, as it came in response to intolerable work conditions and thus, amounted to a constructive discharge.

A plaintiff "may establish an adverse employment action by demonstrating that she [or he] was constructively discharged." Logan v. Denny's, Inc., 259 F.3d 558, 568 (6th Cir. 2001). An employee is constructively discharged when an employer's actions make working conditions so intolerable that a reasonable person under the circumstances would feel compelled to resign. Kocsis v. Multi-Care Mgmt., 97 F.3d 876,

6

887 (6th Cir. 1996). Ohio courts generally apply an objective test to evaluate whether an employee was constructively discharged, evaluating "whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." Mauzy v. Kelly Servs., Inc., 75 Ohio St.3d 578, 589, 664 N.E.2d 1272 (1996). Courts consider a wide range of factors, such as "reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group." Id.

In Handford v. Buy Rite Office Products, Inc., 3 N.E.3d 1245, 1253 (Ohio Ct. App. 2013), an Ohio court of appeals concluded that a plaintiff whose employer failed to take action in response to the plaintiff's complaints that the employer was allegedly engaged in illegal activity was not constructively discharged. Specifically, the employee reported to her employer that it was double billing clients for credit card purchases, and she informed the employer that some employees were smoking marijuana on company premises. Id. at 1252. In response, the employer informed the plaintiff that it did not intend to address the alleged unlawful activities. Id. The employee thereafter claimed that working conditions had become intolerable, and she quit. Id. The court rejected the employee's claim that she was constructively discharged, reasoning as follows:

> we conclude that Buy Rite's actions in this case would not make a reasonable person believe that Handford's termination was imminent. The only action allegedly taken by Handford's employer was that [the supervisor] told Handford that she did not intend to pursue Handford's allegations. Handford resigned within hours of this interaction. Handford was not threatened. She was not criticized or harassed. None of her supervisors insinuated that her position at Buy Rite was in jeopardy. Rather, Handford did not approve of the manner in which [the supervisor] intended to deal with the allegations, and so she "elected

7

>to resign." As a matter of law, [the supervisor's] response to Handford's complaint does not create an actionable claim for constructive discharge.

Id. at 1253.

In this instance, the plaintiff contends that working conditions became intolerable to a reasonable person because the defendants instituted an admissions policy, which he believed was unethical or illegal, and despite his complaints about the policy, Fresenius "made no effort to abate either the new admission policy nor the efforts to involuntarily discharge the patients."(Amended Complaint, ¶35). The plaintiff claims that the defendants instead "chastised" and "retaliated" against him (although he provides no specific details with respect to the defendants' alleged retaliatory actions). Because the plaintiff found it "impossible to align and fully support this initiative" he felt that he "had no alternative but to provide six-week notice of his termination." (Amended Complaint, ¶ 36) The defendants accepted Mr. Swann's resignation and his employment was terminated.

In the Court's view, the plaintiff's Amended Complaint fails to describe working conditions so intolerable that a reasonable person would feel compelled to resign. First, the allegation that management chastised him after he complained about the new policy is insufficient by itself to support a claim of constructive discharge. See Peters v. Lincoln Electric Co., 285 F3d 456, 479 (6th Cir. 2002) ("[H]urt feelings are not enough to create a case of constructive discharge."). While the plaintiff's opposition brief asserts he was given "the choice to either continue his employment by engaging in acts he believed violated the law and showed a reckless disregard for patient safety *or* lose

8

his job," (Doc. 12, p. 14, emphasis in original), there is no such allegation in his Amended Complaint nor does he allege any facts that would support it.

It is not evident, based on the Amended Complaint, that in response to Mr. Swann's concerns about the new policy, that management threatened to fire him, demote him, reduce his job responsibilities or pay, transfer or reassign him, harass him in a manner calculated to encourage him to resign, or take away any benefit to which he was entitled, if he did not carry out the policy. See R.C. 4113.52(B). Except for being "chastised" by management, which cannot by itself form the basis of a constructive discharge claim, there are no allegations that management took any action at all. The only alleged action in response to Mr. Swann's complaints was a non-action, in that Fresenius refused to retract its new admission/discharge policy as the plaintiff demanded. As described in Buy Rite, supra, an employer's refusal to take action in response to an employee's claims that the employer is engaged in illegal activity does not necessarily create intolerable working conditions. While there may be a circumstance in which such a refusal might make work conditions intolerable, Mr. Swann has not persuaded the Court that this is the case.

Mr. Swann has failed to allege facts that support a plausible claim that he was constructively discharged. Therefore, without an allegation that he was subject to an adverse employment action, his claim under the Ohio Whistleblower Act fails on its face.

### B. Wrongful discharge in violation Ohio public policy

To maintain a cause of action for wrongful discharge in violation of public policy, the plaintiff must establish: (1) a clear public policy manifested in the Ohio or United

9

States Constitutions, a statute or administrative regulation, or the common law (the "clarity element"); (2) that the dismissal of employees under similar circumstances would jeopardize the public policy (the "jeopardy element"); (3) that the discharge was motivated by conduct related to the public policy (the "causation element"), and (4) that the employer lacked a legitimate overriding business justification for the plaintiff's discharge (the "overriding justification element"). See Collins v. Rizkana, 73 Ohio St.3d 65, 70 652 N.E.2d 653, 658 (1995).

In this instance, Mr. Swann fails to state a plausible wrongful discharge claim because he resigned from his position, and, as described in the section above, he fails to set forth facts to support the claim that he was constructively discharged.

**C. Breach of Contract**

Mr. Swann alleges that Fresenius breached the Severance Agreement when it failed to pay him a year's severance pay. The Severance Agreement provides, in pertinent part:

> In the event the Company terminates Employee without cause at any time, the Company agrees that…the Company shall pay to Employee Employee's base salary…for an additional twelve (12) months…If Employee is terminated by the Company for any reason other than without cause or Employee terminates his employment with the Company for any reason then Employee shall not be entitled to the benefits described in this Section 5.

(Compl. ¶ 21, Ex. A). Because the plaintiff voluntarily resigned from his position and fails to allege facts in support of his claim that he was constructively discharged, his claim that Fresenius breached the Severance Agreement is not plausible.

**D. Promissory Estoppel**

Mr. Swann alleges that the defendants are liable to him on a theory of promissory estoppel. The Ohio Supreme Court has recognized the doctrine of promissory estoppel, stating that

> [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

McCroskey v. State, 8 Ohio St. 3d 29, 30, 456 N.E.2d 1204, 1205 (1983) (quoting Restatement of the Law, Contracts 2d (1973), Section 90). Thus, to state a claim for promissory estoppel, a plaintiff must allege "a clear and unambiguous promise and reliance by the party to whom the promise is made. The reliance must be reasonable and foreseeable, and the party relying on the promise must have been injured by the reliance." Dailey v. Craigmyle & Son Farms, L.L.C., 177 Ohio App. 3d 439, 446, 894 N.E.2d 1301, 1307 (1996) (citing Doe v. Adkins, 110 Ohio App.3d 427, 437, 674 N.E.2d 731 (1996)).

In this instance, the plaintiff contends the relevant promise is contained in Fresenius' Code of Business Conduct. There, the plaintiff claims, Fresenius promised "that an employee would not be retaliated against for reporting criminal violations . . . ." (Amended Complaint ¶81). The alleged retaliation in this instance is the plaintiff's alleged termination. As above, this claim falls flat because the plaintiff states no facts establishing that the defendants terminated his employment. Further, as the defendants point out, "[g]enerally, employee handbooks do not constitute an employment contract." Stembridge v. Summit Acad. Mgmt., 2006-Ohio-4076, ¶27 (Ohio Ct. App. Aug. 9, 2006)

11

(citing Rudy v. Loral Defense Sys., 85 Ohio App.3d 148, 152, 619 N.E.2d 449 (1993)). Thus, without alleging the existence of a clear and unambiguous promise, the plaintiff has failed to state a plausible promissory estoppel claim.

### E. Loss of Consortium

With the dismissal of all of Mr. Swann's claims, Ms. Swann's derivative claim for loss of consortium is also dismissed.

### III. Conclusion

For the reasons stated above, the defendants' motion to dismiss is granted.

IT IS SO ORDERED.

       /s/ Lesley Wells
    UNITED STATES DISTRICT JUDGE

Date: 4 August 2015